[Doc. No. 22]

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

```
NATASHA HAWKINS,              :
Administratrix of the Estate :
Of Khalil Wallace            :
                             :
            Plaintiff,       :
                             :
    v.                       :    Civil No. 13-7814 (JS)
                             :
GLOBE LIFE INSURANCE CO.,     :
                             :
            Defendant.       :
_____:
```

### OPINION[1]

This Opinion will address whether plaintiff can recover the proceeds of her $50,000 life insurance policy that she bought only weeks before her son was murdered. If the facts surrounding the case were fictional and not so tragic, they would produce a classic law school final examination.

---

[1] On October 16, 2013, Ms. Hawkins initiated this suit against Globe claiming breach of contract, bad faith denial of benefits and a violation of the New Jersey Consumer Fraud Act. The case was removed to this Court on December 23, 2013 on the basis of diversity jurisdiction. See Notice of Removal [Doc. No. 1]. Pursuant to 28 U.S.C. § 636(c), the parties consented to the jurisdiction of this Court to hear the case. [Doc. No. 11]. The subject "Motion for Summary Judgment" [Doc. No. 22] was filed by defendant Globe Life Insurance Company ("Globe"). The Court received the response in opposition from plaintiff Natasha Hawkins, Administratrix of the Estate of Khalil Wallace [Doc. No. 23], and defendant's reply [Doc. No. 25]. The Court recently held oral argument.

1

In late August 2011, Natasha Hawkins ("Ms. Hawkins" or "plaintiff") applied for a second policy of insurance on the life of her nineteen year-old son, Khalil Wallace ("Khalil"), from Globe Life Insurance Company ("Globe"). After Globe received plaintiff's enrollment form and premium payment, but before Globe formally approved the policy, plaintiff's son was murdered. Globe argues plaintiff's policy is void because the policy was not formally approved before Khalil was killed. In the alternative, Globe contends plaintiff's policy is voidable because material misrepresentations and omissions were made during the application process. In opposition plaintiff argues it was her reasonable expectation that she had interim coverage after Globe received her enrollment form and premium payment. Plaintiff also contests that her policy is voidable. Thus, plaintiff argues, since Khalil died while she had interim coverage, and her policy is not voidable, Globe must pay.

These facts give rise to two main legal questions. First: when did plaintiff's life insurance policy take effect? Plaintiff contends her policy took effect on either September 9, 2011, when Globe received her completed enrollment form with the first premium payment, or on September 12, 2011 when her premium check was cashed.[2] Globe argues plaintiff's policy did not become effective

---

[2] For purposes of this Opinion it makes no difference if plaintiff's policy was effective on September 9 or 12, 2011.

until it was formally approved on October 1, 2011, and by that time that Khalil was dead. Second: even if plaintiff's policy was in effect when her son died on September 20, 2011, is the policy voidable because of plaintiff's alleged material misrepresentations or omissions during the application process? Plaintiff maintains she honestly answered all of Globe's questions. Globe argues plaintiff made material misrepresentations and omissions during the application process which makes her policy voidable.

As discussed herein, the Court denies defendant's motion for summary judgment. The Court finds that Globe's solicitation materials were ambiguous as to the date the policy became effective. Based on the record presented, the Court finds that an objectively reasonable applicant expected to receive interim coverage when Globe received plaintiff's completed enrollment form and premium payment. Thus, since the Court interprets Globe's policy to effect the reasonable expectations of plaintiff, plaintiff had interim coverage as of September 9, 2011, the date Globe received her enrollment form and premium payment. As such, plaintiff's policy was in effect when Khalil died on September 20, 2011. The Court also finds that plaintiff did not make any material misrepresentations or omissions during the application process. Thus, plaintiff's policy is not voidable. Accordingly, defendant's motion for summary judgment will be DENIED.

**BACKGROUND**

The following background will provide a detailed chronology of the relevant undisputed facts.[3] Plaintiff previously purchased an insurance policy on the life of her son from Globe. In or around August 2011 Globe mailed plaintiff an advertisement for up to $50,000 in life insurance protection. Def.'s Statement of Material Facts ("SMF") ¶ 1. The materials included two informational pamphlets (Court's Exs. A and B), a letter (Court's Ex. C), and an enrollment form (Court's Ex. D).[4] The following summary lists some of the relevant representations from these materials:

**Pamphlet 1 (Court's Exhibit A)**

- First-day coverage
- No waiting period
- Buy direct by mail
- Choose $5,000, $10,000, $20,000, $30,000 or $50,000 coverage

---

[3] Plaintiff only disputes two of Globe's material facts. Plaintiff disputes that she understood Globe's advertisement as requiring application approval before coverage initiated (SMF ¶ 49) and that Khalil Wallace had a history of drug abuse or treatment (SMF ¶ 51).

[4] The Court is attaching to this Opinion copies of the referenced documents because it is important to see the context in which the key language is used. Pamphlet 1, the Court's Exhibit A, is the pamphlet plaintiff attached to her complaint which she alleges she received from Globe in August 2011. Compl. ¶¶ 2-3. Globe admits the Court's Exhibits B-D "comprise the advertising materials that Globe sent to [p]laintiff in or about August 2011." Decl. of Caroline Brizzolara, Esq. ¶ 4 [Doc. No. 22-3]. Pamphlet 1 is not included in the advertising materials Globe submitted. However, since in this context all facts must be construed in plaintiff's favor, the Court will assume plaintiff received Exhibit A.

4

- $1.00 for $50,000*[5]
- No medical exam – just answer a few health questions

**Pamphlet 2 (Court's Ex. B)**

- Start a Life Insurance Policy for Only $1*

**Letter (Court's Ex. C)**

- No Waiting Period (2x)
- Buy Direct by Mail (2x)
- $1.00* Starts Up To $50,000 Life Insurance Coverage
- Globe gives you life insurance coverage that costs only $1.00* to start!
- There's no medical exam . . . just answer a few Yes/No health questions
- You buy directly through the mail
- Answer A Few Yes/No Health Questions (2x)

**Enrollment Form/Application (Court's Ex. D)**

- No waiting period.
- $1* Buys Up to $50,000
- $1* Buys $50,000 – Direct by Mail
- You can choose from $5,000, $10,000, $20,000, $30,000 or even $50,000 life insurance coverage
- There is no medical exam – just a few Yes/No health questions.

Globe's enrollment form contains four questions, three of which are health-related. At issue here is Question 2.b. This question asks whether in the past three years the proposed insured (Khalil) "had or been treated for . . . drug or alcohol abuse." Id. It is undisputed plaintiff was aware her son was previously

---

[5] The asterisk refers the applicant to the enclosed premium rate table.

arrested and charged with multiple drug offenses. SMF ¶ 7, Response to SMF ¶ 7. It is also undisputed that subsequent to one of Khalil's arrests, plaintiff arranged for Khalil to attend a few counseling sessions with a general therapist. SMF ¶ 14 (citing Hawkins Dep. 39:8-15); see also Hawkins Dep. 41:15-42:3[6]. However, plaintiff denied any knowledge of what her son discussed with his therapist during these sessions. SMF ¶ 13; Hawkins Dep. 42:4-6. She also denied any knowledge that her son used drugs. Hawkins Dep. 38:5-17. Plaintiff testified that despite her son's troubled past she did not believe he abused drugs. She noted that her son was an athlete and never showed symptoms of drug abuse.[7] SMF ¶ 14 (citing Hawkins Dep. 42:4-9, 44:12-19; 54:22-24; 55:6-7); see also Hawkins Dep. 38:5-17.[8]

---

[6] Q: Why did you tell your son to see a therapist?
A: Because he had gotten himself into trouble [. . .]
Q: Would you say that she was a specialist for people who had been involved in drugs?
A: No.
Q: So she was more of a generalist?
A: Yes.

[7] Khalil played college football for Rowan University the previous spring. Def.'s Ex. 8.

[8] Q: Why didn't you think he was taking those drugs?
A: Well, he was an athlete and I never saw him present with symptoms as someone who has been under the influence of drugs or alcohol.
Q: What were those symptoms you would have recognized?
A: Well, somebody had slurred speech, somebody nodding off, somebody acting paranoid, somebody being volatile. I never observed him with any of those symptoms. Pupils dilated or constricted.

Plaintiff read and understood all of the statements contained in her enrollment form. SMF ¶ 16 (citing Hawkins Dep. 96:17-99:24; 100:21-101:24; 106:2-24 and 148:9-21). Plaintiff signed Globe's enrollment form on August 25 or 28, 2011 and mailed it to Globe with a check for the first month's premium of $1.00 for a $50,000 insurance policy on Khalil's life. SMF ¶¶ 6, 17. After plaintiff mailed the enrollment form, Khalil was charged on September 2, 2011 with possession of marijuana. SMF ¶ 18. Plaintiff learned about this arrest within a few days but did not inform Globe. SMF ¶ 19.

Globe received plaintiff's enrollment form and premium payment on September 9, 2011. SMF ¶ 20. Globe cashed plaintiff's check on September 12, 2011. Pl.'s Counter Facts ¶ 5. According to Globe's procedures, plaintiff's application was subject to a "Quality Assurance" ("QA") follow-up call because she was not the proposed insured. SMF ¶ 23. Globe attempted to telephone plaintiff 21 times and sent two letters to verify the truth of the statements on her enrollment form. SMF ¶¶ 24, 25. There is no evidence that plaintiff attempted to purposely evade Globe's calls and letters.

On September 20, 2011, plaintiff's son disappeared into a van with unidentified individuals. SMF ¶ 26. On September 22, 2011 plaintiff was informed that her son was last seen two days prior

and that his cell phone was found in Philadelphia. SMF ¶ 28. The same day plaintiff filed a missing persons report with the state police. SMF ¶ 29. Despite these events, plaintiff testified she was not concerned for her son's safety following his disappearance because he would often be away from home for periods of more than two weeks at a time. SMF ¶ 31 (citing Hawkins Dep. 168:16-23; 172:16-24[9]); see also Hawkins Dep. 178:11-14. Additionally, plaintiff testified that when she filed the missing persons report the police believed her son had run off to avoid charges from his recent arrest. Hawkins Dep. 166:12-20.

On September 28, 2011, plaintiff called Globe to complete the QA call. SMF ¶ 32. During the call plaintiff stated that she "received several calls from [Globe] saying that you have a couple of questions to ask me regarding a policy that I was trying to initiate." SMF ¶ 33 (citing Def.'s Ex. 11, Telephone Tr.). The

---

[9] Q: So at any point after your son disappeared on September 20th, you know, let's assume that when you filed the missing person's report, let's assume you weren't fearful on that day, but after that day, on the 23rd, were you fearful for his physical safety.
A: No.
…
Q: Were you afraid – sometime after you filed the missing person's report, were you afraid your son might have been dead?
A: No.
Q: So from the time that you filed a missing person's report to the time your son's body was recovered you believed he was alive the entire time?
A: Yes.

Globe representative on the call asked plaintiff whether the proposed insured had a history of drug or alcohol abuse. SMF ¶ 34. Plaintiff again denied any knowledge that her son had a history of drug or alcohol abuse or treatment and affirmed that her answers were true to the best of her knowledge. SMF ¶¶ 34-35.

Following the QA call, Globe formally approved plaintiff's policy on October 1, 2011. SMF ¶ 36. On October 6, 2011, six days after the policy was issued, Khalil Wallace's body was found. SMF ¶ 39. The cause of death was determined to be multiple gunshot wounds inflicted on September 20, 2011, the day Khalil went missing. SMF ¶ 39. Plaintiff called Globe to report her son's death on October 24, 2011 and submitted her claim for payment on February 6, 2012. SMF ¶¶ 40, 42. On February 21, 2012 Globe advised it was investigating the claim. SMF ¶ 43. Following an exchange of letters between Globe and plaintiff, on July 6, 2012, Globe advised that it was voiding its policy because plaintiff misrepresented material facts during the application process. SMF ¶ 53 (citing Def.'s Ex. 23).

In sum, the following chronology is critical:

- August 25 or 28, 2011 – Plaintiff mails her application and premium payment

- September 9, 2011 – Globe receives plaintiff's application and premium payment

- September 12, 2011 – Globe cashes plaintiff's premium payment

- September 20, 2011 – Khalil is murdered

- September 28, 2011 – Globe's QA phone call with plaintiff

- October 1, 2011 – Globe formally issues plaintiff's policy

## DISCUSSION

Pursuant to Fed. R. Civ. P. 56, summary judgment is appropriate where the court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . . demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The materiality of a fact turns on whether under the governing substantive law, a dispute over the fact might have an effect on the outcome of the suit. Id. The court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. See Startzell v. City of Phila., 533 F.3d 183, 192 (3d Cir. 2008).

The moving party bears the initial burden of informing the court of the basis for its motion and demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Once the burden is met, the burden shifts to the non-moving party to "set forth specific facts showing that there [are] . . . . genuine factual issues that properly can be resolved only by a finder of

10

fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. The party opposing summary judgment may not "rest upon mere allegation[s] or denials of his pleading," but must set forth specific facts and present affirmative evidence demonstrating that there is a genuine issue for trial. Id. at 256-57.

## A. Procedural Dispute

As a threshold matter, Globe asserts it is entitled to summary judgment because plaintiff denied only two of the facts[10] asserted by Globe in its Statement of Materials Facts, and because plaintiff failed to cite to the record to support her denials. Def.'s Reply Br. at 1. It is true that plaintiff's denials to Globe's Statement of Material Facts are not in strict conformance with L. Civ. R. 56.1(a).[11] See Pl.'s Response to SMF [Doc. No. 23-1]. In such cases,

---

[10] See note 3.

[11] L. Civ. R. 56.1 states: "(a) Statement of Material Facts Not in Dispute On motions for summary judgment, the movant shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion. A motion for summary judgment unaccompanied by a statement of material facts not in dispute shall be dismissed. The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion. In addition, the opponent may also furnish a supplemental statement of disputed material facts, in separately

the court has the discretion to disregard the party's denials.
McCann v. Unum Provident, 921 F. Supp. 2d 353, 359 (D.N.J. 2013)
(party opposing summary judgment's "failure to reference evidence
of record demonstrates that there is no reason to disbelieve the
statements of fact contained in the Paragraphs at Issue."); Jake
Ball Trust v. Durst, C.A. No. 12-5255 (JBS/AMD), 2013 WL 4008802,
at *1 n.1 (D.N.J. Aug. 5, 2013) ("Facts stated by the parties in
their briefs or in their Statements of Material Facts Not in
Dispute which were not supported by record citations were
disregarded by the Court in accordance with L. Civ. R. 56.1(a).").

Globe also argues that because plaintiff's Counter Statement
of Facts is contained within her brief, it violates L. Civ. R.
56.1(a) which requires statements of material facts to be submitted
as a separate document. Def.'s Reply Br. at 3. While plaintiff
submitted a response to defendant's Statement of Material Facts as
a separate document, plaintiff's Counter Statement of Facts is
contained within her brief in violation of the Local Rules. See
Pl.'s Br. at 3-4; L. Civ. R. 56.1(a).[12]

---

numbered paragraphs citing to the affidavits and other documents
submitted in connection with the motion, if necessary to
substantiate the factual basis for opposition. The movant shall
respond to any such supplemental statement of disputed material
facts as above, with its reply papers. Each statement of material
facts shall be a separate document (not part of a brief) and shall
not contain legal argument or conclusions of law."

[12] Defendant also asserts that plaintiff's Counter Statement
of Facts fails to reference evidence of record. Def.'s Reply Br.

While the Court is troubled by plaintiff's failure to comply with the Local Rules, in the interest of justice it exercises its discretion not to require strict compliance. Boswell v. Eoon, 452 Fed. Appx. 107, 111-12 (3d Cir. 2011) (permitting the non-movant to rely on its briefing and evidentiary submissions to dispute the movant's statement of material facts); see also L. Civ. R. 56.1 Comment 2(e).[13] Further, the Court acknowledges the Third Circuit's preference that cases be disposed of on the merits whenever practicable. Hritz v. Woma Corp., 732 F.2d 1178, 1181 (3d Cir. 1984); E.A. Sween Co. v. Deli Exp. of Tenafly, LLC, 19 F. Supp. 3d 560, 566 (D.N.J. May 13, 2014). Thus, while plaintiff failed to cite to the record in support of her denials to defendant's Statement of Material Facts, the Court will consider plaintiff's briefs and evidentiary submissions as they sufficiently draw the Court to relevant evidence.[14] The Court will also consider plaintiff's Counter Statement of Facts contained within her brief though it was not filed as a separate document. While the Court

---

at 2-3. On this point, the Court disagrees. Plaintiff's Counter Statement of Facts sufficiently cites to evidence of record.

[13] L. Civ. R. 83.2 (any Local Rule may be relaxed or dispensed with by the Court if adherence would result in injustice).

[14] Even if all of defendant's facts were undisputed, the Court must still find summary judgment appropriate. Fennimore v. Lower Twp., C.A. No. 09-2090 (RMB/KMW), 2011 WL 1705599, at *1 n.1 (D.N.J. May 4, 2011); Muskett v. Certegy Check Servs., Inc., C.A. No. 08-3975 (JBS/JS), 2010 WL 2710555, at *3 (D.N.J. July 6, 2010).

declines to impose sanctions on plaintiff for the failure to follow the Local Rules, plaintiff is on notice that the Court will not be as lenient in the future.

Having considered defendant's procedural argument, the Court turns to the substantive issues.

### B. When did plaintiff's policy take effect?

#### 1. The Reasonable Expectations Doctrine

Plaintiff argues the solicitation materials she received from Globe along with the fact that she answered "No" to all of the health-related questions led her to believe that she received interim coverage when Globe received her application materials on September 9, 2011. Pl.'s Br. at 13 (citing Hawkins Dep. 104:6-21); Hawkins Dep. 135:1-3.[15] In support of her belief that interim coverage was in effect at the time of Khalil's death, plaintiff points to Globe's solicitation materials which repeatedly state that there is "No waiting period" and "First-day coverage", amongst other representations implying immediate interim coverage. See Court's Ex. D. Plaintiff also highlights that Globe cashed her

---

[15] At one point in plaintiff's deposition she stated that she believed coverage took effect on the date she mailed her application materials. Hawkins Dep. 104:8-9. Other times plaintiff clarified that she thought coverage began when her application materials were received by Globe. See Hawkins Dep. 129:12-20 (Q: So the policy would be approved as soon as they received it in the mail? A: Yes.), 137:20-23, 144:18-23, 145:12-16. The distinction between the date plaintiff mailed her enrollment form and the date Globe received it does not affect the outcome of this motion.

premium check eight days before Khalil's death. Pl.'s Br. at 14. Globe argues that plaintiff's argument is a "sham" and the advertising materials repeatedly noted that its policy was not effective until approved. Def.'s Br. at 20.

Recognizing that the language of insurance contracts is often the result of technical semantic constructions and unequal bargaining power, New Jersey courts interpret insurance policies to give effect to the reasonable expectations of an objectively reasonable policyholder. Oritani Sav. & Loan Ass'n v. Fid. & Deposit Co. of Maryland, 989 F.2d 635, 638 (3d Cir. 1993); DiOrio v. New Jersey Mfrs. Ins. Co., 79 N.J. 257, 269 (1979) (citing Kievit v. Loyal Protective Life Insurance Co., 34 N.J. 475, 482–83 (1960)). As a result, courts resolve ambiguities in insurance contracts against the insurer. Oritani, 989 F.2d at 638. Where the language of an insurance policy is not facially ambiguous, courts must still determine "whether the policy language is insufficiently clear such that the average policyholder would be deprived of a reasonable expectation of coverage." Id. The reasonable expectations doctrine does not solely apply to those bound by a policy agreement, but also applies to a dispute regarding the "very existence" of an insurance contract. Von Milbacher v. Teachers Ins. & Annuity Ass'n, C.A. No. 88-1033 (CSF), 1988 WL 113353, at *2 (D.N.J. Oct. 24, 1988), on reconsideration

in part, 1988 WL 142322 (D.N.J. Dec. 20, 1988) (citing Allen v. Metropolitan Life Ins., 44 N.J. 294 (1965)).

Insurance policies are ambiguous if the "phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." Dayekh ex rel. Dayekh v. Thyssen Krupp Elevator Corp., C.A. No. 10-5109 (SDW), 2013 WL 3285020, at *3 (D.N.J. June 25, 2013) (citing Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 247 (1979)); see also State Nat. Ins. Co. v. Cnty. of Camden, C.A. No. 08-5128 (NLH/AMD), 2014 WL 1301501 (D.N.J. Mar. 31, 2014) ("an insurance policy is not ambiguous merely because two conflicting interpretations have been offered by the litigants, and a genuine ambiguity exists when the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage."). However, the court must not write a better contract than the one the parties entered into. Seidenberg v. Mut. Life Ins. Co. of New York, 949 F. Supp. 269, 276 (D.N.J. 1996), aff'd, 135 F.3d 766 (3d Cir. 1997); Am. Cas. Co. of Reading Pennsylvania v. Resolution Trust Corp., 839 F. Supp. 282, 290 (D.N.J. 1993) ("If there is no ambiguity, a strained or distorted construction will not be indulged in and the clauses in an insurance policy will be given their ordinary and usual meaning.").

Whether the terms of a policy are clear or ambiguous is a question of law. Nester v. O'Donnell, 301 N.J. Super. 198, 210

(App. Div. 1997). If a court determines that a term in the policy is ambiguous it may look to extrinsic evidence to aid its interpretation. Newport Associates Phase I Developers Ltd. P'ship v. Travelers Cas. & Sur. Co., 2013 WL 10090299, at *9 (N.J. Super. Ct. App. Div. Jan. 16, 2015) (citing Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231, 238 (2008)).

The Court finds Globe's promotional documents are ambiguous and should be interpreted to meet the reasonable expectations of an objectively reasonable applicant. The Court finds ambiguity for two related reasons. One, Globe's solicitation materials, along with the fact that plaintiff answered "No" to all of the health-related questions, leads an objectively reasonably insurance applicant to expect immediate interim coverage once Globe receives the application materials. Two, notwithstanding Globe's solicitation materials, an objectively reasonable applicant expects interim coverage after Globe accepted the applicant's premium payment.

The Court first considers Globe's solicitation materials which included two informational pamphlets, a letter, and an enrollment form. See Klos v. Mobil Oil Co., 55 N.J. 117, 125 (1969) (construing application and brochure together to determine applicant's reasonable expectations); President v. Jenkins, 180 N.J. 550, 567 (2004) (considering language of binder and policy together and finding ambiguity). There are a number of

representations within Globe's solicitation materials which lead an objectively reasonable applicant to believe that interim coverage is provided, even before a policy is formally approved.[16] These include Globe's representations regarding "first-day coverage", "no waiting period" and an applicant's ability to "buy directly through the mail."

Globe's pamphlet expressly states that Globe is offering "First-day coverage". Without any qualification, the statement is easily read to indicate that interim coverage begins immediately. Directly underneath "First-day coverage" are the representations that applicants can "Buy direct by mail" with "No waiting period." These statements read together indicate that an applicant can submit an application by mail and receive immediate interim coverage.

Globe's second pamphlet states that submission of the enrollment form can "start" a life insurance policy for $1.00. This representation is easily read to indicate that submission of suitable application materials initiates interim coverage. The pamphlet further states that if the applicant's responses to the application show good health, coverage begins after the

---

[16] Even if Globe is correct that the first pamphlet (Court's Exhibit A), which was attached to plaintiff's complaint, was not actually mailed to plaintiff, there are other ambiguous representations in the solicitation materials Globe submitted. Further, the vast majority of the content contained in the first pamphlet is repeated in other materials.

application is approved. Here, plaintiff answered "No" to all of the health-related questions in the application. Thus, it was her reasonable belief that since she answered that the insured was in "good health," interim coverage applied.[17] The word "approved" later on in the sentence is not qualified or explained and does not suggest underwriting. "Approved" could also mean that the applicant need only show good health based on the responses to the questions on the application, as plaintiff testified. Hawkins Dep. 142:15-19; 144:18-23 ("[The solicitation materials indicate] that once they receive my application there's no waiting period, which means they are going to review it that day. And if there's no bad health or yes responses they would issue my policy and send it out and I would be covered from the first day.").

Globe's letter contains additional ambiguous representations. The letter states several times in large font, "No waiting period" and "Buy Direct By Mail". As discussed, these representations suggest immediate coverage. The large and bolded font emphasize that plaintiff was reasonable in expecting interim coverage even before her policy was formally approved. The body of Globe's letter also states that $1.00 "starts" up "coverage". Although the letter later states in non-bolded text that the policy will be mailed

---

[17] To be clear, the Court does not find that an applicant would have a reasonable expectation of interim coverage if he or she misrepresented or omitted material facts.

once the application is "approved," Globe still fails to qualify what that entails. Further, even if a reasonable applicant understood that "approval" included an underwriting process, it does not eliminate the impression that interim coverage exists while the application is processed.

Globe's letter also states that "Your FULL protection starts the first day your policy is issued. There is no waiting period." These sentences create ambiguity because Globe states that full protection starts when the policy is issued, but simultaneously promises no waiting period. Thus, the impression is created that policy issuance and coverage is immediate. Globe would have a better argument if instead of its ambiguous language it would have stated, "Your coverage starts only IF your policy is approved by Globe after receipt and review of your completed application", and if it omitted the promise of "first-day coverage" and "no waiting period."

Even Globe's enrollment form states twice that a $1.00 premium payment "buys" $50,000 of coverage. Additionally, the enrollment form reiterates that there is "No waiting period." Globe points to the fact that the enrollment form contains two authorizations in a much smaller font which state that "the insurance applied for will become effective on the date this enrollment form is approved [by Globe] during the lifetime of the insured." See Court's Ex. D. However, it is unclear whether "approval" is linked to an

20

underwriting process or is based on the submission of an enrollment form which reports no health-related problems.[18] Additionally, the allusion to an approval process is ambiguous given the other representations discussed which lead an applicant to believe he or she is receiving immediate interim coverage.

Globe's font sizes and text locations further plaintiff's impression that she received interim coverage. Representations concerning immediate coverage such as "$1.00 Starts Up to $50,000 Life Insurance Coverage" and "No waiting period" appear in bold and large font (see, e.g., Court's Exhibit C) while the "approval" language, which Globe emphasizes in support of its argument, appears in the authorization in much smaller font (see, e.g., Court's Exhibit D).

In order to meet the reasonable expectations of the insured, New Jersey courts "depart from the literal text and interpret [a policy] in accordance with the insured's understanding, even when that understanding contradicts the insurer's intent, if the text appears overly technical or contains hidden pitfalls, cannot be understood without employing subtle or legalistic distinctions, is

---

[18] See also Von Milbacher v. Teachers Ins. & Annuity Ass'n, C.A. No. 88-1033 (CSF), 1988 WL 113353, at *6 (D.N.J. Oct. 24, 1988), on reconsideration in part, 1988 WL 142322 (D.N.J. Dec. 20, 1988) (finding ambiguity in a teacher's association insurance application and determining that the term "approval" in the materials could mean that the insurance company need only confirm that the applicant was a teacher).

obscured by fine print, or requires strenuous study to comprehend." Zacarias v. Allstate Ins. Co., 168 N.J. 590, 601 (2001) (internal citations omitted); Interstate Aerials, LLC v. Great Am. Ins. Co. of New York, 352 Fed. Appx. 637, 640 (3d Cir. 2009) (accord); see also Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595 (2001) ("When there is ambiguity in an insurance contract, courts interpret the contract to comport with the reasonable expectations of the insured, even if a close reading of the written text reveals a contrary meaning."). Globe's solicitation materials lead an applicant to believe they receive interim coverage even before their policy is formally approved. Only through the "fine print" language of Globe's authorization is the "hidden pitfall" revealed that the representations of "First-day coverage" and "No waiting period" are not accurate.[19] The Court thus finds Globe's use of the phrases "No waiting period", "First-day coverage", and other representations discussed herein, to be misleading and ambiguous. The Court honors plaintiff's reasonable expectations of interim coverage "even though painstaking study of the policy provisions would have negated those expectations." Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595 (2001) (quoting Sparks v. St. Paul Ins. Co., 100 N.J. 325, 338-39 (1985)). Accordingly, the Court finds

---

[19] At oral argument Globe submitted that "no waiting period" refers to the period of time after the application is approved. This is not what an objectively reasonable applicant would believe.

that plaintiff had interim coverage on her son's life as of September 9, 2011, the day Globe received her application materials.

### 2. Receipt of Plaintiff's Premium

Besides the ambiguity in Globe's solicitation materials there was another good reason for plaintiff to objectively believe she had interim coverage. Globe received plaintiff's premium check on September 9, 2011 and cashed the check on September 12, 2011. This belief is supported by considerable New Jersey precedent. A seminal case applying the reasonable expectations doctrine to an insurance application is Allen v. Metro. Life Ins. Co., 44 N.J. 294, 310 (1965). In Allen the proposed insured submitted an application and first annual premium and received a conditional receipt in exchange which stated that coverage was retroactively effective once the application was approved. Id. at 296-97. The court found that "the very acceptance of the premium in advance tends naturally towards the understanding of immediate coverage though it be temporary and terminable." Id. at 302. The Court continued:

> When the company's representatives solicited Allen they could readily have taken his application without any advance premium. For reasons important to the company and to its financial advantage, they sought and obtained the annual premium in advance on the assertion that their receipt would afford immediate coverage. There can hardly be any question as to Allen's reasonable expectations in the circumstances.

Id. at 306.

23

Additionally, the Court finds <u>Von Milbacher v. Teachers Ins. & Annuity Ass'n</u>, C.A. No. 88-1033 (CSF), 1988 WL 113353 (D.N.J. Oct. 24, 1988), <u>on reconsideration in part</u>, 1988 WL 142322 (D.N.J. Dec. 20, 1988), instructive. In <u>Von Milbacher</u>, Herk Van Tongeren received a solicitation for life insurance which included an application and 7-page brochure. <u>Id.</u> at *1. After Mr. Van Tongeren paid his full premium payment his insurance company asked him to undergo further medical testing. Before Mr. Von Tongeren could comply with this request, he died. The insurance company denied that a policy existed because the application was not approved during the life of the insured.

The court held that the doctrine of reasonable expectations will "effect" a binder when two elements are present: "(a) events comprising a solicitation for insurance which are ambiguous in that they can support an objective and reasonable expectation of interim coverage, and (b) the insurer's failure to terminate the interim contract." <u>Von Milbacher</u>, 1988 WL 113353, at *5. The court found that:

> A fact which does much to suggest a binder is the solicitation and payment of an initial premium. Such payments can have no other contemplated benefit to the insured than immediate coverage. To the insurer however, such payments serve to tie the proposed insured to his choice while perhaps providing ready, unearned, and risk-free income. A binder both effects the insured's reasonable expectations of immediate coverage, and requires the insurer to afford protection in return for sums paid to it.

24

Von Milbacher, 1988 WL 113353, at *5 (footnote omitted). The court noted that receipt of a binder or conditional receipt is not a "prerequisite" to the doctrine of reasonable expectations. Von Milbacher, 1988 WL 113353, at *5 n.4.

The Von Milbacher ruling is consistent with Ransom v. Penn Mut. Life Ins. Co., 43 Cal. 2d 420, 274 P.2d 633 (1954), a case adopted by the New Jersey Supreme Court in which the applicant did not receive a binder or conditional receipt. See Allen, 44 N.J. at 310 ("Though Ransom . . . arose in one of our sister states, they evidence an approach which we consider to be highly persuasive and not incompatible with prior judicial decisions in our own State."). In Ransom, Ralph Ransom completed his application, paid his first premium, and underwent a medical examination. Id. at 423. He did not receive a conditional receipt or binder in exchange. The insurer later requested that Mr. Ransom undergo a further examination. Id. Before this could be arranged, Mr. Ransom was killed in an automobile accident. Id. The court noted that the question before it was "whether a contract of insurance arose immediately upon receipt by defendant of the completed application with the premium payment, subject to the right of defendant to terminate the agreement[.]" Id. The court found that a contract of insurance arose when the insurance company received the application with the first premium payment. Id. at 425. The court found that "such a person upon reading the application would

25

believe that he would secure the benefit of immediate coverage by paying the premium in advance of delivery of the policy." Id.[20]

The Court has already found that based on Globe's solicitation materials and the fact that she answered "No" to all of the health-related questions on the enrollment form, plaintiff had an objectively reasonable belief that she had interim coverage once Globe received her application materials. Additionally, based on New Jersey precedent, plaintiff also had a reasonable expectation of coverage once Globe received and deposited her premium payment. When Globe accepted plaintiff's premium payment, a contract arose, subject to Globe's right to terminate the agreement. Globe received plaintiff's application materials on September 9, 2011 and deposited the premium check on September 12, 2011. For the reasons described above, this initiated interim coverage on Khalil's life as of September 9 or 12, 2011. Accordingly, plaintiff had interim coverage when Khalil died on September 20, 2011.

Globe argues plaintiff knew she did not receive interim coverage when she submitted her application and premium payment. Globe points to plaintiff's statement during the QA call on

---

[20] Additional authority exists where New Jersey courts look to the doctrine of reasonable expectations and find coverage where the applicant died before the final determination of insurability. See Life Ins. Co. of N. Am. v. De Chiaro, 68 N.J. Super. 93, 107 (Ch. Div. 1961); Shannon v. Prudential Ins. Co. of Am., 90 N.J. Super. 592, 601 (Ch. Div. 1966); and Klos v. Mobil Oil Co., 55 N.J. 117 (1969).

September 28, 2011 that she was calling in regard to a policy she was "trying to initiate." (SMF ¶ 33). The Court disagrees with Globe's argument that plaintiff's statement gives rise to a legal admission. The Court will not impute a technical meaning to plaintiff's remark when there is no evidence this is what she intended.

To sum up the previous discussion, Globe argues that its solicitation materials specifically stated coverage was not effective until approved by the company during the life of the insured. Globe argues that since Khalil died before plaintiff's policy was formally approved on October 1, 2011, no coverage is afforded to plaintiff. The Court has rejected Globe's argument for two reasons. First, the numerous representations in the solicitation materials lead a reasonable applicant to believe they are receiving interim coverage while the policy is processed, provided the applicant demonstrates the proposed insured is in good health. Globe's other representations that coverage begins once the policy is "approved" do not override Globe numerous representations that there is "First-day coverage" and "No waiting period". Globe mainly relies on the language, tucked away in small font on its enrollment form, to rebut its representations and plaintiff's expectation that Globe offered interim coverage. However, Globe's references do not eliminate the impression that interim coverage is offered while the application is processed.

27

Second, New Jersey precedent provides that plaintiff had a reasonable expectation of coverage once Globe accepted her premium payment. "Such payments can have no other contemplated benefit to the insured than immediate coverage." Von Milbacher, 1988 WL 113353, at *5. Additionally, the Court rejects Globe's argument that plaintiff's statement during the QA call that she was trying to initiate a policy amounts to a legal admission. For these reasons, Globe's application for summary judgment on plaintiff's breach of contract claim is denied.

### C. Is plaintiff's policy voidable?

### 1. Material Misrepresentations and Omissions

Globe alternatively argues that even if plaintiff's policy was in effect at the time Khalil died on September 20, 2011, the policy is voidable because plaintiff made material misrepresentations and omissions during the application process constituting equitable fraud.[21] Globe alleges that plaintiff falsely answered a health question or her application regarding Khalil's past drug abuse, failed to disclose Khalil's September 2, 2011 arrest for marijuana possession, and failed to inform Globe that she reported Khalil missing on September 22, 2011. As will be

---

[21] Equitable fraud is one of Globe's two counterclaims. See Am. Answer [Doc. No. 14]. The other counterclaim is violation of the Insurance Fraud Prevention Act, which the Court will discuss in section C.2., infra.

discussed, the only relevant alleged misrepresentation or omission is plaintiff's original application submitted in August 2011.

A false statement in an application for life insurance will bar the beneficiary from recovery if "such false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer." N.J.S.A. 17B:24-3d. Massachusetts Mut. Life Ins. Co. v. Manzo, 122 N.J. 104, 113 (1991); Remsden v. Dependable Ins. Co., 71 N.J. 587, 589, 367 A.2d 421, 423 (1976) ("It is settled that a material factual misrepresentation made in an application for insurance may justify rescission if the insurer relied upon it to determine whether or not to issue the policy."); Formosa v. Equitable Life Assur. Soc. of U. S., 166 N.J. Super. 8, 21 (App. Div. 1979) ("Every fact which is untruly stated or wrongfully suppressed must be regarded as material, if the knowledge or ignorance of it would naturally and reasonably influence the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium.") (citation omitted).

The law draws a distinction between misrepresentations made in response to an insurance company's objective and subjective questions. "Objective questions call for information within the applicant's knowledge, such as whether the applicant has been examined or treated by a physician." Ledley v. William Penn Life Ins. Co., 138 N.J. 627, 635 (1995). If the question is objective,

even an innocent misrepresentation can warrant rescission and constitutes equitable fraud. Id.; Golden v. Nw. Mut. Life Ins. Co., 229 N.J. Super. 405, 414 (App. Div. 1988). Courts are more lenient when the question is subjective. Id.

The application question at issue asked plaintiff: "In the past 3 years, has the Proposed Insured had or been treated for . . . drug or alcohol abuse[?]" Plaintiff answered this question "No". Globe asserts that because plaintiff was aware that her son was arrested for drug-related crimes and attended general therapy she should have answered the question in the affirmative. The Court disagrees. The problem with Globe's argument is that it did not ask the right question. Globe did not ask if Khalil was ever arrested. Nor did it ask if Khalil ever possessed or distributed drugs, or was accused of same. Instead, Globe specifically chose to limit the language in its question. Globe's question only asks if Khalil, the insured, had or was treated for drug abuse. Globe has failed to point to any evidence that this occurred. For this reason, the Court finds that Globe has not satisfied its burden of showing that plaintiff misrepresented any answers on her application.

Relatedly, plaintiff did not have a duty to inform Globe about her son's September 2, 2011 arrest for marijuana possession. Again, Globe never inquired whether the insured had a criminal history on the insurance application. Additionally, that fact that Khalil's

30

arrest is not material is evidenced by the fact that Globe did not ask plaintiff any questions during the September 28, 2011 QA call which would have required her to inform Globe about the arrest. Further, while Globe has demonstrated that a history of drug abuse or treatment was material to its approval of plaintiff's application, it has not demonstrated that knowledge of a drug arrest is similarly material.[22] See IFA Ins. Co. v. Mercury Indem. Co. of Am., C.A. No. A-6124-09T4, 2011 WL 3329363, at *4 (N.J. Super. Ct. App. Div. Aug. 4, 2011) ("A misrepresentation is material if it naturally and reasonably influence[d] the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium.") (internal quotations omitted). Under Globe's argument, an insurer could seek to void almost any policy by claiming that a policyholder made a material omission regarding the insured's background, regardless if that omission was material to the insurer's risk. Accordingly, the Court finds plaintiff did not have an affirmative duty to inform Globe about her son's September 2, 2011 arrest for marijuana possession.

---

[22] In his affidavit submitted in support of Globe's motion for summary judgment, Nick I. Danner, Globe's New Business and Underwriting Manager, affirmed that Globe would not have approved plaintiff's policy if: (1) Khalil had a history of drug abuse or counseling or (2) Globe had known Khalil disappeared on September 20, 2011. Aff. of Nick L. Danner ¶¶ 7-8. Mr. Danner does not attest that Globe would not have issued the policy if it knew Khalil was arrested for marijuana possession.

Globe also alleges plaintiff had a duty to inform it, at least during the QA call on September 28, 2011, that she had reported her son missing on September 22, 2011. The Court need not decide this issue. Interim coverage began on September 9, 2011 when Globe received plaintiff's application materials and premium check. Khalil died on September 20, 2011, while plaintiff's interim coverage was in effect. Accordingly, Globe had a duty to pay plaintiff on the policy as of September 20, 2011. What plaintiff said or did not say during the September 28, 2011 phone call is irrelevant. Globe argues a material omission plaintiff made after September 20, 2011 makes plaintiff's policy voidable. This is incorrect. "Every fact which is untruly stated or wrongfully suppressed must be regarded as material, if the knowledge or ignorance of it would naturally and reasonably influence the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium." Formosa v. Equitable Life Assur. Soc. of U. S., 166 N.J. Super. 8, 21 (App. Div. 1979). Globe cannot rely on omissions made after its duty to pay arose. Any false representations or omissions which plaintiff allegedly made after that time are immaterial as Globe's duty to pay had already ripened. Accordingly, summary judgment on Globe's equitable fraud counterclaim is denied.

**D. Fraud**

Plaintiff alleges in her complaint that the misrepresentations in Globe's solicitation materials regarding immediate coverage violate the N.J. Consumer Fraud Act N.J.S.A. 56:8-1 et seq. (the "CFA"). Globe moves for summary judgment on this claim which plaintiff did not specifically oppose.[23] The relevant portion of the CFA provides:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice[.]

N.J.S.A. § 56:8-2. To state a claim under this provision a consumer must prove "(1) an unlawful practice, (2) an ascertainable loss, and (3) a causal relationship between the unlawful conduct and the ascertainable loss." Gonzalez v. Wilshire Credit Corp., 207 N.J. 557, 576 (2011) (internal citations omitted)." A consumer who proves these elements is entitled to legal and/or equitable relief, treble damages, and reasonable attorneys' fees. Id. "To determine

---

[23] An unopposed motion is properly granted when the movant is entitled to judgment as a matter of law. Anchorage Associates v. Virgin Islands Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990). Thus, even though plaintiff did not formally oppose defendant's argument defendant is not automatically entitled to summary judgment. It still must prove it is entitled to the judgment.

whether an advertisement or solicitation makes a false or misleading representation, the court must consider the effect that the advertisement, taken as a whole, would produce on one with an ordinary and unsuspecting mind." Belmont Condo. Ass'n, Inc. v. Geibel, 432 N.J. Super. 52, 80 (App. Div. 2013). The CFA is constrained to "fraudulent, deceptive or other similar kind of selling or advertising practices." D'Agostino v. Maldonado, 216 N.J. 168, 189 (2013) (citing Daaleman v. Elizabethtown Gas Co., 77 N.J. 267, 271 (1978)).

While New Jersey courts hold that the payment of policy benefits is not subject to the CFA, the language of the statute is broad enough to "encompass the *sale* of insurance policies as goods and services that are marketed to consumers." Granelli v. Chicago Title Ins. Co., 569 Fed. Appx. 125, 133 (3d Cir. 2014) (emphasis in original) (citing Lemelledo v. Beneficial Mgmt. Corp. of America, 150 N.J. 255 (1997)).

The Court previously determined, supra, that an objectively reasonable applicant would expect coverage to begin immediately based on the representations in Globe's solicitation materials and Globe's acceptance of plaintiff's premium payment. However, the determination of whether Globe's materials were fraudulent or deceptive is a question of fact. Stewart v. Smart Balance, Inc., C.A. No. 11-6174 (JLL), 2012 WL 4168584, at *9 (D.N.J. June 26, 2012); Leon v. Rite Aid Corp., 340 N.J. Super. 462, 469 (App. Div.

2001) ("Although there may be some circumstances in which an advertisement is so patently deceptive that a violation of the Consumer Fraud Act may be found as a matter of law, the determination whether an advertisement is misleading is ordinarily for the trier of fact—here the jury—to decide."). Because the Court finds that whether or not Globe violated the CFA is a question of fact, Globe is not entitled to summary judgment on this claim.

Globe, in turn, alleges that plaintiff violated the Insurance Fraud Prevention Act, N.J.S.A. 17:33A-1, (et seq.) ("IFPA"), by making a "knowing misrepresentation of material fact to induce Globe to issue a policy it never would have issued had it known the truth." Def.'s Br. at 18. Specifically, Globe alleges plaintiff violated sections N.J.S.A. 17:33A-4 (a)(3) and (a)(4)(b) which state that a person violates the act if s/he:

> (3) Conceals or knowingly fails to disclose the occurrence of an event which affects any person's initial or continued right or entitlement to (a) any insurance benefit or payment or (b) the amount of any benefit or payment to which the person is entitled; [or]

> (4) Prepares or makes any written or oral statement, intended to be presented to any insurance company or producer for the purpose of obtaining: [ . . .](b) an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to an insurance application or contract;

Globe alleges plaintiff violated these two provisions by failing to disclose her son's past drug abuse and disappearance. For the

reasons already discussed, the Court finds that plaintiff did not make a material misrepresentation during the application process. Thus, the question remaining is whether plaintiff's failure to disclose her son's disappearance when she learned about it on September 22, 2011 constitutes a violation of the IFPA. As previously discussed, at the time of the insured's death, interim coverage was in effect. When the insured died, Globe had a duty to pay on the policy. Misrepresentations or omissions which occurred subsequent to the creation of this duty are immaterial because plaintiff was already entitled to the policy benefits. In other words, Globe was not "induced" to issue the policy based on this alleged omission. Accordingly, Globe's application for summary judgment on its IFPA counterclaim is denied.

### E. Bad Faith

Globe also moves for summary judgment on plaintiff's bad faith claim. The New Jersey Supreme Court has established a "fairly debatable" standard to determine whether an insurer has acted in bad faith:

> To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. It is apparent, then, that the tort of bad faith is an intentional one . . . implicit in that test is our conclusion that the knowledge of the lack of a reasonable basis may be inferred and imputed to an insurance company where there is a reckless . . .

36

indifference to facts or to proofs submitted by the insured.

*Pickett v. Lloyd's*, 131 N.J. 457, 473 (1993) (citation omitted). In order to determine whether an insured's decision denying coverage was made in bad faith the insured must first be granted summary judgment on the issue of coverage. *Hudson Universal, Ltd. v. Aetna Ins. Co.*, 987 F. Supp. 337, 342 (D.N.J. 1997). Because plaintiff has not moved for summary judgment on the issue of coverage the Court cannot determine whether defendant acted in bad faith.[24] As such, defendant's motion for summary judgment on plaintiff's bad faith claim is denied.

## CONCLUSION

Accordingly, for all the foregoing reasons, Globe's motion for summary judgment [Doc. No. 22] is denied. The Court finds that plaintiff had a reasonable expectation of interim coverage based on the materials she received from Globe and because Globe received her enrollment form and first premium payment during Khalil's life. As such, Globe's application for summary judgment on plaintiff's breach of contract claim is denied. Globe's application for summary judgment on its counterclaims of equitable fraud and violation of

---

[24] The Court has determined that plaintiff had an objectively reasonable expectation that she had interim coverage when Khalil died. However, the Court will not *sua sponte* enter judgment in favor of the insured as to coverage as plaintiff has not moved for this relief by filing a cross-motion.

the Insurance Fraud Prevention Act is also denied. Whether Globe violated the New Jersey Consumer Fraud Act remains a question of fact and is not appropriately decided on summary judgment. Last, summary judgment on plaintiff's bad faith claim is denied.

An appropriate Order follows.

s/ Joel Schneider
JOEL SCHNEIDER
United States Magistrate Judge

Dated: May 12, 2015